## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

FILED

00 NOV -9 PM 2: 39

| | |
|---|---|
| DONALD B KEYS<br>983 Pembrook Road<br>Cleveland Height, Ohio 44121 | ) CASE NO.<br>)<br>) JUDGE _____<br>) |
| Plaintiff, | ) |
| | ) |
| Vs. | ) |
| | ) |
| MINNESOTA MINING AND<br>MANUFACTURING COMPANY<br>3M Center<br>St. Paul, Minnesota 55144 | ) **COMPLAINT**<br>)<br>) (Jury Demand Endorsed Herein)<br>)<br>) |
| Defendant. | )<br>) |

1:00CV2842

JUDGE NUGENT

MAG. JUDGE STREEPY

---

Now comes the plaintiff Donald B. Keys and alleges:

### I.    Introduction

1.    This is an action for compensatory, statutory and punitive damages brought by an individual against a corporation for patent infringement, breach of contract, antitrust violations and other related claims.

### II.    Jurisdiction

2.    This Court has original jurisdiction of any civil action arising under any Act of Congress relating to patents and/or a patent infringement suit pursuant to 28 USCA Section 1338(a).

3.    This Court has original jurisdiction of any civil action arising under any Act of Congress relating to antitrust violations [any unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce], pursuant to 15 U.S.C. Section 45 (a) (1).

This court has supplemental and diversity jurisdiction of the contract and other related claims.

## III.    Parties

4.    Plaintiff is an Ohio resident and has been for all times relevant.

Defendant is a Delaware corporation whose principal place of business is located in Saint Paul, Minnesota and who manufactures and distributes various retail and commercial products to the State of Ohio.

## IV.    Cause of Action - Patent Infringement

5.    On May 6th, 1997, Plaintiff was duly and legally granted United States Letters Patent No. 5,626,175 for an invention in an Improvement in Clear Plastic Film Indoor Window Insulation Kits and since that date plaintiff has been and still is the owner of those Letters Patent.

6.    Defendant has for a long time past been and is still infringing those Letters Patent by instructing their customers to infringe upon Plaintiff's Letters Patent, and will continue to do so unless enjoined by this court.

7.    Plaintiff has given verbal and written notice to defendant of such infringement and demanded same infringement cease.

8.    The infringement described herein has caused great and irreparable damage to plaintiff and will continue same unless enjoined by this Court.

## V.    Cause of Action -- Breach of Contract

9.    Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

10.    On or about 3/19/96, Plaintiff and Defendant, by and through duly authorized defendant's Vice President, executed an Option Agreement, attached hereto as Plaintiff's Exhibit M.

11.　　Defendant had a duty to negotiate and contract in good faith.

12.　　Defendant breached its duty to negotiate and contract in good-faith by entering into the Option Agreement with plaintiff under the false pretenses, that defendant was considering negotiating with plaintiff for the commercial use of the intellectual property rights described in plaintiff's New Product Proposal.  Plaintiff alleges that defendant misrepresented the Option Agreement to plaintiff and failed to contract with plaintiff in good faith, by entering into the agreement with plaintiff and not disclosing to plaintiff that defendant had records and files of prior art in the area of plaintiff's new product proposal; which defendant was aware would have been a factor in plaintiff's decision to enter into the Option Agreement with defendant.

13.　　Plaintiff alleges that defendant had reviewed plaintiff's patent application and defendant was well aware that plaintiff could use the prior art known by defendant to strengthen plaintiff's patent by amending and narrowing the scope of plaintiff's patent claims to avoid the reference of the prior art known by defendant in plaintiff's patent claims.

14.　　Plaintiff alleges that defendant's infringement of plaintiff's United States Patent makes it now obvious that defendant purposely and maliciously did not disclose to plaintiff the prior art known by defendant, so that defendant could argue any potential patent infringement charges bought against defendant by plaintiff, in the gray areas of the broader claims of plaintiff's patent.

15.　　Plaintiff alleges that in April of 1995, when plaintiff first disclosed plaintiff's New Product Proposal to defendant, defendant was not obligated to inform plaintiff of any prior art that defendant may have known in the area of plaintiff's New product Proposal. Plaintiff alleges however that when defendant made the decision to draft an Option Agreement between defendant and plaintiff and then proposed the Option Agreement to plaintiff; at that point defendant was obligated to genuinely contract and negotiate with plaintiff in good-faith.

16.　　Plaintiff alleges however that after defendant had reviewed and evaluated the intellectual properties of plaintiff's New Product Proposal, defendant then drafted and disingenuously proposed and contracted the Option Agreement between defendant and plaintiff in bad-faith.  Defendant breached defendant's duty to contract and negotiate with

plaintiff in good-faith by deceptively drafting and proposing the contract of the Option Agreement between defendant and plaintiff, when defendant had knowledge that a conflict of interest existed between defendant's projects and the area of plaintiffs New Product Proposal.

17.     Defendant breached its duty to contract and negotiate in good-faith in that defendant; (1) misrepresented defendant's interest to purchase or license intellectual property rights from plaintiff; (2) misrepresented, in failing to disclose, defendant's own development and ongoing development of a competitive product; (3) misrepresented, in failing to disclose, defendant's intentions to distribute new product packages instructing its customers on how to infringe upon the Plaintiff's Letters Patent; and (4) misrepresented defendant's intentions and purpose for the Option Agreement.

18.     The Defendants Breach of Contract has caused great and irreparable damage to plaintiff.


**VI.     Cause of Action - Misrepresentation.**


19.     Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

20.     Defendant, through its agents, officers, employees and official documents, made intentional false and misleading statements to plaintiff.


**VII.     Cause of Action - Antitrust Violations**


21.     Plaintiff repeats and re-alleges and incorporates by reference the foregoing paragraphs.

22.     Plaintiff alleges that defendant, in violation of antitrust laws, used unfair methods of competition against plaintiff in and affecting commerce, and unfair and deceptive acts and practices against plaintiff in and affecting commerce.

23.     Plaintiff alleges that defendant (a powerful international corporation) used its tremendous financial, technical, marketing and legal resources against plaintiff

(a private inventor), to execute a series of illegal and deceptive acts; designed to restrict the development and marketing of plaintiff's new product, which would be a competitive product with defendant's "3M Indoor Window Insulator Kit".

24.    In early January 1995, plaintiff contacted defendant's External Ideas Administrator, regarding submitting an idea to improve and upgrade defendant's product "3M Indoor Window Insulator Kit".

25.    On or about January 19, 1995, defendant's External Ideas Administrator, by U.S. mail forwarded a letter and information to plaintiff, explaining defendant's policy for receiving external ideas and provided plaintiff with defendant's official publication (About Your Idea) which included a Non-Confidential Idea Submission Agreement and a Non-Confidential Questionnaire. (attached hereto as Plaintiff's Exhibit B)

26.    On or about April 3, 1995 plaintiff forwarded to defendant's External Ideas Administrator; a cover letter attached hereto as Plaintiff's Exhibit C;

- a signed copy of the Non-Confidential Idea Submission Agreement between defendant and plaintiff, which included information disclosing plaintiff's invention,

- a signed copy of the Non-Confidential Information Questionnaire, which included information disclosing plaintiff's marketing ideas and general product information and

- a copy of plaintiff's Patent Application which had been filed on plaintiff's idea (patent claims not included.

27.    Plaintiff alleges that since that time, plaintiff has been and continues to be the victim of defendant's deceptions, misrepresentations and antitrust violations.

28.    Plaintiff alleges that between April 3, 1995 and March 19, 1996, there were numerous communications between plaintiff and defendant's marketing and legal department, wherein defendant through its agents, officers and employees, made false statements, misleading statements and other misrepresentations to plaintiff by by expressing interest in either purchasing or licensing the intellectual property rights of plaintiff's invention.

29.    Plaintiff alleges false statements and misrepresentations made by defendant to plaintiff includes a May 18, 1995 letter from defendant to plaintiff wherein defendant's External Ideas Administrator, Marie M. Lee's letter stated, paraphrased;

that there may be some interest. The May 18, 1995 letter also requested plaintiff to send defendant more information to complete the evaluation of plaintiff's new product proposal.

30.     The additional information requested from plaintiff by defendant included,
(1) information on the status of plaintiff's patent application, (2) a copy of plaintiff 's patent claims, (3) a prototype model of plaintiff's invention and (4) any additional information to help in the evaluation process.(defendant's May 18, 1995 letter to plaintiff, requesting additional information from plaintiff, attached hereto as plaintiff's Exhibit D)

31.     On or about July 7, 1995, via U.S. mail plaintiff forwarded to defendant's External Ideas Administrator, a cover letter and the specific information defendant had requested in defendant's May 18, 1995 letter also included was a video tape disclosing plaintiff's patent pending process for installing Access Ports in the plastic film of an Indoor Window Insulation Kit assembly ; plaintiff's July 7,1995 cover letter sent to defendant, outlining the information sent to defendant by plaintiff, attached hereto as plaintiff's Exhibit E,  (Video Tape, Plaintiff's Exhibit EE not attached hereto).

32.     Plaintiff alleges false and misleading statements made to plaintiff by defendant includes statements made in voicemail messages from defendant to plaintiff, recorded by plaintiff's telephone answering system; wherein defendant expressed interest in marketing plaintiff's product.

33.     On October 10, 1995, Art Pluim, an employee of defendant's Do-It-Yourself Division left a recorded message on plaintiff's telephone answering system. The message was defendant's response to plaintiff's request for an update on defendant's evaluation of plaintiff's patent application and defendant's evaluation of plaintiff's New Product Proposal

34.     The October 10, 1995 voicemail message left by defendant's Do-It-Yourself Division employee, ArtPluim stated, paraphrased; that a very, very strong interest continued in defendant's Marketing Department and that as soon as defendant's Legal Department was herded through the process, defendant would contact plaintiff. (transcript of defendant's October 10, 1995 taped voicemail message attached hereto as plaintiff's Exhibit F)

35. Defendant's false statements and misrepresentations to plaintiff includes

statements made in a taped January 11, 1996 voicemail message from defendant's
Do-it-Yourself Division employee, Art Pluim.

36.     The January 11, 1996 taped voicemail message from defendant's employee
Art Pluim stated, paraphrased; the material sent to defendant by plaintiff, including
plaintiff's patent application, had been reviewed by defendant's Legal Department and the
feedback was positive.

37.     The January 11, 1996 taped voicemail message from defendant's employee
Art Pluim also stated, paraphrased; defendant's Marketing Department would be send-
Ing plaintiff a letter indicating defendant's interest and asking plaintiff what did plaintiff
want? (transcript of defendant's January 11, 1996 taped voicemail message attached
hereto as plaintiff's Exhibit G)

38.     Plaintiff alleges that plaintiff never received the letter promised by Art Pluim in
defendant's January 11, 1996 voicemail message.

39.     Plaintiff alleges defendant's false statements and misrepresentations to
plaintiff includes statements made by defendant to plaintiff during a January 15, 1996
telephone conference, initiated by defendant's Intellectual Property Counsel, Doreen
Gwin, wherein defendant through it employees, expressed interest in acquiring plaintiff's
Intellectual Property Rights.

40.     Plaintiff alleges that during the January 15,1996 telephone conference, plaintiff
was asked by Doreen Gwin if plaintiff had filed for foreign patent protection and plaintiff
answered that plaintiff had not.  Doreen Gwin stated, paraphrased; 3M is an international
company and would want plaintiff to get international patent protection for the product.

41.     Plaintiff alleges that during the January 15, 1996 telephone conference, plaintiff
was asked by defendant if plaintiff had shown plaintiff's product to other companies and
plaintiff stated that plaintiff had not.

42.     Plaintiff alleges that during the January 15, 1996 telephone conference, plaintiff
was asked by defendant to provide defendant with the manufacturing cost of plaintiff's
product.

43.     Plaintiff alleges that defendant's deceptions and misrepresentations to plaintiff
includes statements made to plaintiff by defendant's Intellectual Property Counsel,

Doreen Gwin, during a January 23, 1996, 10:30 A.M. telephone conference between Doreen Gwin, plaintiff and Mark Svat (patent attorney for plaintiff).

44. The January 23, 1996, 10:30 A.M. telephone conference between plaintiff and defendant's Intellectual Property Counsel was initiated by plaintiff to get clarification on exactly what defendant expected from plaintiff in terms of the product manufacturing costs requested from plaintiff by defendant, during the January 15, 1996 telephone conference.

45. Plaintiff was advised by Doreen Gwin that her role was intellectual property only and Doreen Gwin gave plaintiff a telephone number for defendant's Brand Manager of the Do-it-Yourself/Construction Markets Division, Matt Storey.

46. Plaintiff alleges that during the January 23, 1996, 10:30 A.M. telephone conference, Doreen Gwin inquired about plaintiff's foreign patent filing status and proposed to plaintiff, that defendant would pay plaintiff's PCT foreign patent filing costs if plaintiff would enter into an Option Agreement with defendant. Doreen Gwin proposed that in compensation for defendant's offer to pay plaintiff's PCT foreign patent filing cost, the proposed Option Agreement would have terms giving defendant first right to negotiate for plaintiff's intellectual property rights.

47. Plaintiff alleges defendant's misrepresentation to plaintiff includes, statements made to plaintiff by defendant's Brand Manager of the 3M Do-it-Yourself/Construction Markets Division (Matt Storey).

48. Plaintiff alleges that during a January 23, 1996 11:00 A.M. telephone conference between defendant's employee (Matt Storey), plaintiff (Donald Keys) and plaintiff's attorney (Mark Svat): defendant through its employee (Matt Storey) made false, deceptive and misleading statements to plaintiff, leading plaintiff to believe that defendant had plans to add plaintiff's product to the 3M 1997 product line.

49. The January 23, 1996 11:00 A.M. telephone conference with defendant's Brand Manager of the 3M Do-it- Yourself/Construction Markets Division (Matt Storey), was initiated by plaintiff to get clarification on exactly what defendant expected from plaintiff in terms of product manufacturing costs, requested by defendant during the (January 15, 1996) telephone conference between defendant and plaintiff.

50. Plaintiff alleges that during the January 23, 1996, 11:00 A.M. telephone

conference with defendant's employee, Matt Storey, plaintiff expressed plaintiff's concerns and asked Matt Storey, paraphrased; why did defendant (with all off the technical resources available to defendant) want plaintiff to provide defendant with product manufacturing cost.

- Plaintiff explained to Matt Storey, that considering the simplicity of the product and the small amount of material required to make each component, the manufacturing cost should not be a factor.

- Plaintiff explained to Matt Storey, that it was plaintiff's understanding that the prototype models made specifically for defendant by plaintiff, were for demonstration and feasibility purposes only and the production models which would be sold to the consumer would be different.

- Plaintiff explained to Matt Storey, that it was plaintiff's understanding that defendant's Research and Development Department would do the final product design and develop manufacturing techniques for the production run of the product.

- Matt Storey stated, paraphrased; his people had a lot of projects going but they (defendant) were doing a cost analyst on plaintiff's product and defendant's engineers were looking at the prototypes sent by plaintiff and that he (Matt Storey) should get a report back from defendant's manufacturing department in about sixty days.

- Matt Storey insisted, paraphrased; he (Matt Storey) still wanted plaintiff to send him manufacturer's tooling costs and unit bids for plaintiff's version of a production model of plaintiff's product.

- Matt Storey stated, paraphrased; after he (Matt Storey) received the information from defendant's manufacturing department and the product manufacturing costs from plaintiff, the product would then go to defendant's lab for testing; weather conditions (hot and cold) and the performance of different adhesives etc.

- Matt Storey gave plaintiff the name and telephone number of Paul Raber, (a project engineer for defendant) and asked plaintiff to send Paul Raber a

copy of any additional information or different concepts plaintiff might have on plaintiff's invention.

- Matt Strorey stated, paraphrased; plaintiff's product would hit the retail shelves in 1997, since defendant's 1996 selling season was already underway.

51.  Plaintiff alleges defendant made false statements, deceptive statements and misleading statements to plaintiff through oral and written communications with plaintiff's patent attorney, Mark Svat.

52.  On January 30, 1996 at 2:00 P.M., patent attorney for plaintiff, Mark Svat, received a telephone call from defendant's Intellectual Property Counsel, Doreen Gwin: wherein defendant continued to lead plaintiff to believe that defendant was interested in obtaining intellectual property rights from plaintiff and marketing plaintiff's product.

- Doreen Gwin asked Mark Svat for an update on plaintiff's progress in providing defendant with product manufacturing costs and additional technical information which  defendant's, Brand Supervisor for Energy, Matt Storey, had requested plaintiff to send to defendant during the January 23, 1996 11:00 A.M. telephone conference between plaintiff and defendant .

- Doreen Gwin stated, paraphrased; as soon as they (defendant) received the requested information from plaintiff on plaintiff's product manufacturing costs plus the technical information requested by defendant, defendant's Office of Intellectual Property Counsel would send plaintiff a draft of the proposed terms of an Option Agreement between defendant and plaintiff.

- Doreen Gwin stated, paraphrased; there would be no problem with plaintiff making the PCT (foreign patent) filing deadline because they (defendant) would work something out in the Option Agreement that both parties (defendant and plaintiff) would be agreeable to.

53.  Plaintiff alleges that plaintiff was apprehensive about defendant's motive when defendant insisted that plaintiff provide defendant with manufacturing costs for plaintiff's product.  Plaintiff alleges that defendant was well aware that defendant's request from plaintiff would require plaintiff (who had limited technical and financial resources) to do time-consuming research and the technical drawings necessary to submit to

manufacturers in order to obtain quotes for tooling costs and unit bids for the production run of plaintiff's proposed product.

54.    Plaintiff alleges that defendant was  aware that defendant's request, (for plaintiff to provide defendant with product manufacturing costs) would consume much of plaintiff's available time; locating different manufacturers for each component of the product, contacting and communicating with different manufacturers of each component and submitting and reviewing technical drawings and different manufacturing options with each manufacturer.

55.    Plaintiff alleges that plaintiff suspected that, (since defendant has almost unlimited financial and technical resources) defendant's request was disingenuous and was a staling tactic by defendant to keep plaintiff occupied and to divert plaintiff from contacting defendant's competitors; while defendant was extorting plaintiff's invention.

56.    Plaintiff alleges that because of plaintiff's concerns that defendant might have ulterior motives and plans to extort plaintiff's invention, plaintiff initiated telephone conferences with individuals who had experience in product development and marketing, and expressed plaintiff's concerns;

- On January 21, 1996 plaintiff conferred with, Donald C. Keys (Research and Development Engineer for AMSCO of Erie, Pennsylvania).

- On January 22,1996 plaintiff conferred with plaintiff's, patent attorney, Mark Svat.

- On January 27, 1996 plaintiff conferred with, William Taylor (Research and Development Engineer for Venture Lighting of Solon Ohio).

- On February 9, 1996 plaintiff conferred with Michelle S. Rochon (Human Resource Manager for General Electric Lighting Division of Cleveland Ohio). Michelle Rochon referred plaintiff to General Electric patent attorney, George Hawranko.  Michelle Rochon also referred plaintiff to a General Electric Lighting Division marketing manager, Marvin Ellison, who was familiar with  new product development in large corporations.

- On February 9, 1996, patent attorney, George Hawranko, called plaintiff and conferred with plaintiff about plaintiff's concerns.

- On February 12, 1996. Marvin Ellison met with plaintiff at plaintiff's home and conferred with plaintiff about plaintiff's concerns.
- On February 14, 1996 plaintiff conferred with Clarence Edwards (Senior Research and Development Engineer at AMSCO of Erie Pennsylvania).

57.   Plaintiff alleges that plaintiff was advised by plaintiff's patent attorney, Mark Svat, and other individuals plaintiff conferred with, to send defendant all the information defendant had requested and to keep a journal and a chronologically-documented record of all communications between defendant and plaintiff.  Plaintiff was also advised that if defendant's intentions were not honorable, plaintiff would soon know and plaintiff would have a chronologically-documented record of all of defendant's actions.

58.  On February 18, 1996, plaintiff forwarded to Maft Storey (defendant's Brand Supervisor for Energy) by U.S. mail, a package accompanied with a cover letter, attached hereto as Plaintiff's  Exhibit H. The package forwarded to defendant contained:

- technical drawings for each component of plaintiff's product (Plaintiff's Exhibit I),
- bids which plaintiff had obtained from different manufacturers for tooling costs and production costs to produce plaintiff's product in different quantities (Plaintiff's Exhibit J),
- a second video tape made by plaintiff for defendant, showing an optional way to raise and lower roller shades through the plastic film of an Indoor Window Insulation Kit assembly; employing a different concept than previously disclosed to defendant by plaintiff (Plaintiff's Exhibit K) and
- a separate package containing all of the aforementioned information except for the video tape, was enclosed for Paul Raber's review (defendant's DIY Project Engineer).

59.   On February 23, 1996 (via facsimile) defendant's Intellectual Property Council, Doreen Gwin, forwarded to plaintiff's patent attorney (Mark Svat); a cover letter and a draft of defendant's proposed Option Agreement between defendant (3M Company) and plaintiff (Donald B. Keys):

- plaintiff objected to the length of the negotiation period proposed by defendant and
- defendant agreed to shorten the negotiation period as requested by plaintiff.

(Defendant's February 23, 1996 cover letter and defendant's first draft of the proposed Option Agreement attached hereto as **Plaintiff's Exhibits  A  and  L**).

60.    On or about March 19, 1996 plaintiff's patent attorney, Mark Svat, received from defendant, via U.S. mail, two final version copies of the Option Agreement between plaintiff and defendant.  Mark Svat also received a cover letter instructing plaintiff to sign both copies of the Option Agreement, send one copy back to defendant and keep one copy for plaintiff's records:

- Defendant's Vice Chairman and Executive Vice President (Dr. R. A. Mitsch) had signed both copies of the Option Agreement on March 15, 1996 before they were forwarded to plaintiff.

- On March 19, 1996, plaintiff signed both copies of the Option Agreement and returned one copy to defendant and kept one copy for plaintiff's records.

- The terms of the Option Agreement gave defendant the first right to negotiate for intellectual property rights of plaintiff's product.

- The Option  Agreement had terms which restricted plaintiff from showing or offering plaintiff's intellectual property rights to other companies or individuals during the option period.

- Terms of the Option Agreement stated; as for full consideration for the options granted in the Option Agreement, defendant (3M Company) agreed to pay the filing cost for plaintiff to file a PCT (foreign patent) application for and on behalf of plaintiff's invention.  The amount was not to exceed five thousand dollars ($5,000.00).

- Terms of the Option agreement stated, that defendant was to exercise defendant's option by giving notice to plaintiff by U.S. certified mail postmarked by July 1, 1996.  (A signed copy of the Option Agreement between plaintiff and defendant and a copy of the cover letter from defendant's Intellectual Counsel, Doreen Gwin, attached hereto as Plaintiff's Exhibit M).

61.    Plaintiff alleges that after plaintiff signed the Option Agreement, restricting plaintiff from marketing plaintiff's product to defendant's competitors, defendant ceased communicating with plaintiff about marketing plaintiff's product.

62.     On or about July 1,1996, at the request of plaintiff, plaintiff's patent attorney, (Mark Svat) contacted defendant's Intellectual Property Counsel, Doreen Gwin.  Mark Svat inquired about the status of defendant's position in regards to the Option Agreement between plaintiff and defendant.  Doreen Gwin informed Mark Svat that 3M (defendant) had decided not to go forward with plaintiff's proposal.

63.     Plaintiff alleges that plaintiff's long distance telephone records will show that after July 1, 1996, plaintiff made numerous attempts to contact defendant's, Do-it-Yourself Division Marketing Manager, Matt Storey, to inquire about defendant's abrupt change in defendant's decision to go forward with plaintiff's New Product Proposal.

        Plaintiff alleges that voicemail messages left by plaintiff for Matt Storey went unanswered by defendant.

64.     Plaintiff alleges that after making numerous telephone calls to defendant's Do-it-Yourself Division, plaintiff was finally informed by a division employee that Matt Storey no longer works in that division.  Plaintiff was instructed to direct any further communication regarding plaintiff's product proposal to David Albers and was given a telephone number to call.  Plaintiff alleges that Dave Albers did not return plaintiff's telephone calls.

65.     Plaintiff alleges that plaintiff, to no avail, made numerous telephone calls to defendant's Do-it-Yourself Division in an attempt to speak with a manager or a supervisor, to ask why defendant had decided not to go forward with plaintiff's new product proposal. Plaintiff alleges that when plaintiff would give plaintiff's name, plaintiff would be told that no one was available to talk to plaintiff.

66.     Plaintiff alleges that after making numerous telephone calls in an attempt to reach a manager or a supervisor in defendant's Do-it-Yourself Division, plaintiff finally spoke to defendant's Marketing Supervisor / Energy Saving Products, Jeffrey J. Peterson.

    • Plaintiff alleges that Jeffrey Peterson was very rude, laughed and was
        sarcastic when he (Jeffrey Peterson) informed plaintiff, paraphrased; he
        believed that a decision had been made by defendant (3M) about plaintiff's
        product.

67.     Plaintiff alleges that in October of 1996, plaintiff initiated a telephone conference with Jeffrey Peterson, to inform defendant's Do-it-Yourself Department that plaintiff had developed a new product which was an upgrade to plaintiff's original product proposal.

- Plaintiff alleges that Jeffrey Peterson was once again very rude to plaintiff and stated, paraphrased; that he (Jeffrey Peterson) believed that we (Jeffrey Peterson and plaintiff) had talked about plaintiff's product before and if plaintiff had an improvement to plaintiff's original design, it would have to be submitted to defendant's External Ideas Department.

- Plaintiff alleges that plaintiff informed Jeffrey Peterson, that plaintiff's United States Patent had been issued with new and amended claims; which were not the same patent claims which defendant's Intellectual Property Counsel reviewed at the time plaintiff submitted plaintiff's new product proposal to defendant.  Plaintiff informed Jeffrey Peterson that the first draft of the patent claims submitted to defendant, for review with plaintiff's New Product Proposal, were drafted by plaintiff.  Plaintiff informed Jeffrey Peterson that the new and amended patent claims, which had been granted by the Unite States Patent Office, were drafted by plaintiff's patent attorney.

- Plaintiff informed Jeffrey Peterson, that the United States Patent Office had allowed all of the new and revised claims of plaintiff's patent application and defendant might reconsider defendant's decision after reviewing claims allowed by the United States Patent Office.

- Plaintiff alleges that Jeffrey Peterson became very irritated and asked plaintiff if plaintiff was recording the telephone conversation and hung up on plaintiff.

68.    Plaintiff alleges that plaintiff concluded that it was useless to try to communicate with Jeffrey Peterson.  Plaintiff contacted defendant's Personnel Department and was given the name and title of Jeffrey Peterson's supervisor to direct future communications to defendant.  Plaintiff was referred to Mark Farmer.

69.    On September 15, 1997, plaintiff sent Mark Farmer, defendant's Business Manager for the Do-It-Yourself /Construction Markets Division, a package by U.S. certified mail article No. Z285-285-751.  The package contained:

- a cover letter describing an improvement upgrading plaintiff's original product, (attached hereto as Plaintiff's Exhibit N)

- a prototype of plaintiff's improved product (A Flexible Magnetic Access Port/Ventilation Retrofit  Assembly Kit with a Removable and a Re-attachable

Cover) which allows blinds to be opened and closed and also allows a room to be ventilated through the plastic film of an installed Indoor Window Insulation Kit assembly,(Plaintiff's Exhibit O)

- a brochure with computer graphics detailing the installation of plaintiff's Flexible Magnetic Access Port/Ventilation system to an Indoor Window Insulation Kit assembly (attached hereto as Plaintiff's Exhibit P) and

- a copy of plaintiff's issued United States.Patent No. 5,626,175.  (attached hereto as Plaintiff's Exhibit Q)

70.    On or about September 18, 1997, plaintiff initiated a telephone conference with defendant's Business Manager for the Do-It-Yourself /Construction Market Division, Mark Farmer.  Plaintiff's telephone call was to follow-up on the information plaintiff forwarded to Mark Farmer on September 15, 1997.  Plaintiff alleges that during the telephone conference between Mark Farmer and plaintiff:

- Mark Farmer informed plaintiff that he (Mark Farmer) had reviewed the information sent by plaintiff and had forwarded the package to Jeffrey Peterson.

- Plaintiff alleges that Mark Farmer stated, paraphrased; the Ventilation System for the plastic film was interesting but defendant (3M) had already addressed the problem of operating blinds through the plastic film of an installed Indoor Window Insulator Kit.  Mark Farmer asked plaintiff, paraphrased; if plaintiff had seen defendant's new 1997 package design for defendant's (3M) Indoor Window Insulator Kit?

- Plaintiff alleges that plaintiff answered Mark Farmer, paraphrased; that plaintiff had seen the new packages for defendant's, 3M Indoor Window Insulator Kit, but plaintiff had not looked at them closely.

- Plaintiff alleges that Mark Farmer described to plaintiff, the new instructions added on the package of defendant's 1997, 3M Indoor Window Insulator Kit; instructing the customer on how to install an access port on the plastic film of an Indoor Window Insulator Kit and how to operate mini blinds through the plastic film.

- Plaintiff alleges that after Mark Farmer described the new instructions added to the package for defendant's, 3M 1997 Indoor Window Insulator Kit, plaintiff

informed Mark Farmer, paraphrased; that it sounded like 3M had infringed plaintiff's patent rights.

- Plaintiff alleges that Mark Farmer stated, paraphrased; that he (Mark Farmer) had not been in on the decision to make the changes for defendant's, 3M Indoor Window Insulator Kit's packaging design but if defendant had infringed plaintiff's patent rights, defendant would cease-and-desist.

71.    Plaintiff alleges that after the September 18, 1997 telephone conference with Mark Farmer, plaintiff purchased one of defendant's 1997 3M Indoor Window Insulator Kits. (Package for defendant's 1997 3M Indoor Window Insulator Kit with added instructions, attached hereto as Plaintiff's Exhibit R)

Plaintiff alleges that after reviewing the new instructions, added to the 1997 3M Indoor window Insulator Kit, plaintiff's suspicions that defendant had infringed plaintiff's United States Patent Rights, were confirmed.

72.    On or about September 22, 1997, plaintiff received a telephone call (on plaintiff's cellular telephone) from defendant's Marketing Supervisor ⁄ Energy Saving Products, Jeffrey Peterson.  Plaintiff alleges that Jeffrey Peterson asked plaintiff, paraphrased; to give defendant until October 10, 1997, to review and respond to plaintiff's new product proposal.

Plaintiff alleges that plaintiff asked Jeffrey Peterson, paraphrased; what was defendant going to do about defendant's infringement of plaintiff's United States Patent Rights and Jeffrey Peterson's response was "no comment".

73.    On October 10, 1997, plaintiff was delivered a package from defendant by FedEx. The package from defendant contained:

- most of the information in the package sent to Mark Farmer by plaintiff on September 15, 1997; noticeably missing from the package was the copy of plaintiff's United States Patent No 5,626,175.

- a video tape of a Hometime Television Show copyrighted 1992 (Plaintiff's Exhibit S)

- a cover letter dated October 5, 1997, from Jeffrey Peterson, stating that an episode of the Hometime Television Show, which aired in October 1992, and in

September 1993, demonstrated techniques for accessing window blinds and
shades through window insulation film,

- the letter stated that free copies of the broadcast were made available by
defendant to several thousand consumers,

- the letter from Jeffrey Peterson also stated that in view of the video disclosure,
defendant did not wish to pursue a business relation with plaintiff (October 5,
1997 cover letter from Jeffrey Peterson, attached hereto as Plaintiff's Exhibit T).

74.    Plaintiff alleges that plaintiff read Jeffrey Peterson's (October 5, 1997) letter.
Plaintiff then reviewed the video tape of the Hometime TV Show (sent to plaintiff by
defendant).  Plaintiff then examined the new, written and graphic instructions defendant
added to the back of the package of defendant's (3M) 1997 Indoor Window Insulator Kit.
Plaintiff then reviewed the claims in plaintiff's United States Patent No. 5,626,175.

75.    Plaintiff alleges that after plaintiff reviewed and compared all of the related
elements, (1) the Hometime TV Show video tape sent to plaintiff by defendant; (2) the new
instructions added to defendant's 1997 3M Indoor Window Insulator Kit, (3) the
instructions on defendant's 3M Indoor Window Insulator Kits prior to 1997 and (4) the
claims in plaintiff's United States Patent No.5,626,175; it became obvious that defendant
knowingly, willingly and maliciously added new written and graphic instructions to the
package of defendant's 1997 3M Indoor Window Insulator Kit, which infringed upon
plaintiff's United States Patent No.5,626,175. (copy of Instructions on defendant's 3M
Indoor Window Insulator Kit prior to 1997 attached hereto as Plaintiff's Exhibit U)  (copy of
3M Indoor Window Insulator Kit package with new instructions added  in 1997, attached
hereto as Plaintiff's Exhibit R)

76.    Plaintiff alleges that the new instructions added by defendant to defendant's 1997
3M Indoor Window Insulator Kit makes it obvious that defendant did not negotiate the
Option Agreement between defendant and plaintiff in good faith.

77.    Plaintiff alleges that on or about April 21, 1998, plaintiff forwarded by U.S. mail, a
certified letter to defendant's Vice Chairman and Executive Vice President, Dr. Ronald A.
Mitsch (defendant's officer who signed the Option Agreement between defendant and
plaintiff) and put defendant on notice that defendant was infringing plaintiff's United States
Patent No 5,626,175.  Plaintiff proposed an out of court resolution between plaintiff and

defendant. (Copy of plaintiff's letter to Dr. Ronald A. Mitsch, attached here to as Plaintiff's Exhibit V.)

78.   Plaintiff alleges that defendant did not respond to plaintiff's April 21, 1998 letter to defendant's Vice Chairman and Executive Vise President, Dr. Ronald A. Mitsch.

79.   On or about December 7, 1998 the Law Office of Michael J. Callow, at the request of plaintiff, forwarded a letter to defendant's Intellectual Property Counsel, Doreen Gwin. The December 7, 1998 letter to defendant gave defendant a second notice from plaintiff of defendant's violation of plaintiff's United States Patent Rights. The December 7, 1998 letter also carried a cease-and-desist demand for defendant to stop defendant's acts of patent infringement against plaintiff and asked defendant to compensate plaintiff for prior damages done to plaintiff by defendant's acts of patent infringement. (Plaintiff's December 7, 1998 letter attached hereto as Plaintiff's Exhibit W)

80.   On or about December 9, 1998, defendant's Intellectual Property Counsel, David B. Patchett, responded, by U.S. mail, to plaintiff's December 7, 1998 letter to Doreen Gwin. Defendant's letter from David B. Patchett stated that defendant's Intellectual Property Counsel, David B. Patchett was in the process of investigating plaintiff's allegations. (David B. Patchett's December 9, 1998 letter attached hereto, as Plaintiff's Exhibit X)

81.   On or about December 18, 1998, defendant's Intellectual Property Counsel, David B. Patchett, forwarded by U.S. mail, a letter to the Law Office of Michael J. Callow. Defendant's December 18, 1998 letter from David B. Patchett stated that defendant had done a preliminary investigation of plaintiff's allegations that defendant was infringing plaintiff's United States Patent Rights. Defendant's December 18, 1998, letter also stated that it was defendant's opinion that defendant was not infringing plaintiff's United States Patent Rights and reiterated reasons given by defendant's Jeffrey Peterson's October 5, 1997, letter (Plaintiff's Exhibit T).  (Defendant's December 18, 1998, David B. Patchett, letter attached hereto as Plaintiff Exhibit Y).

82.   On or about April 14, 1999, the Law Office of Michael J. Callow responded to defendant's December 18, 1998 letter from defendant's Intellectual Property Counsel, David B. Patchett.  Attorney Michael J. Callow's letter was forwarded to defendant by U.S. mail and stated that plaintiff's patent analysis supported plaintiff's initial opinions that defendant's product continued to infringe upon plaintiff's United States Patent Rights.

Attorney Michael J. Callow's, April 14, 1999 letter to defendant also stated, paraphrased; that in spite of defendant's references to the Hometime video tape, the reasons given by defendant (in David B. Patchett's December 18, 1998 letter) were not legal not grounds for defendant to continue violating plaintiff's duly and legally granted United States Patent. (Michael J. Callow's, April 14, 1999, letter responding to David B. Patchett's December 18, 1998 letter attached hereto as Plaintiff's Exhibit YY)

83.   On or about June 7, 1999, defendant's Intellectual Property Counsel, David B. Patchett's responded to Attorney Michael J. Callow's April 14, 1999 letter. David B. Patcheft's, June 7, 1999 letter stated, that defendant had completed a thorough investigation of plaintiff's allegations that defendant was infringing plaintiff's United States Patent Rights.

84.   The June 7, 1999 David B. Patchett letter was a four-page letter which summarized, in chronological order, events defendant alleges to have occurred between plaintiff and defendant after April 3, 1995 when plaintiff submitted plaintiff's first new product proposal to defendant. (David B. Patchett's June 7, 1999 letter/summary attached hereto as Plaintiff's Exhibit Z).

85.   Plaintiff alleges that defendant's Intellectual Property Counsel, David B. Patchett's June 7, 1999 summary of events between plaintiff and defendant, is more evidence of defendant's pattern of deceptions and misrepresentations to plaintiff.

86.   Plaintiff alleges that defendants Intellectual Property Counsel, David B. Patchett's June 7, 1999 letter/summary is a deceptive concoction put together by defendant in an attempt to attack the validity of plaintiff's duly and legally granted United States Patent and hide defendant's illegal acts against plaintiff.

87.   Plaintiff alleges that in an attempt to challenge the validity of plaintiff's United States Patent Rights, through David B. Patchett's June 7, 1999 summary; defendant's summary unwittingly provided evidence of other illegal and deceptive acts against plaintiff by defendant including but not limited to: (1) contract violations, (2) antitrust violations and (3) the willful, intentional and continued violation of plaintiff's United States Patent No. 5,626,175.

88.   Plaintiff alleges that in paragraph ten 10) of David B. Patchett's June 7, 1999 summary, defendant stated, paraphrased; that it was not until September of 1997, (after plaintiff had submitted plaintiff's second product proposal to defendant) before plaintiff's proposals were brought to the attention of individuals within defendant's Do-it-Yourself

Markets Division who were familiar with work defendant had done in the area of plaintiff's new product proposals. (Plaintiff's first new product proposal to defendant was actually submitted April 3, 1995.)

89.  Plaintiff alleges that defendant's claim in paragraph ten (10) of David B. Patchett's June 7, 1999 summary; (that it was not until September of 1997 before plaintiff's new product proposals were not brought to the attention of individuals within defendant's Do-It-Yourself Markets Division who were familiar with prior work defendant had done in the area of plaintiff's new product proposals) is a direct contradiction to the information provided by defendant to plaintiff in defendant's policy booklet "About Your Idea". (Plaintiff's Exhibit B)

90.  Paragraph two (2) of David B. Patchett's June 7, 1999 summary states, "3 M External Ideas Administrator, sent Mr. Keys (plaintiff) a letter on January 19, 1995, explaining 3M's policy for receiving ideas and provided Mr. Keys with the 'About Your Idea' booklet ..."

91.  Plaintiff alleges that defendant's "About Your Idea" booklet is a thirteen-page (1 3) booklet, which explains in explicit detail, defendant's policy for handling external ideas. Defendant's "About Your Idea" booklet also has a flowchart (on page 3 and on page 13) which graphically displays defendant's stage-by-stage evaluation process for external ideas.

92.  Plaintiff alleges that defendant's "About Your Idea" booklet clearly states with great emphasis throughout the booklet, that it is a top priority of defendant to avoid conflicts of interest between any external idea proposal and any of defendant's past or current research.

- Page (2) paragraph (1) states; "To avoid conflicts of interest, 3M has found it necessary to adopt certain ground rules for considering ideas submitted to 3M by outside persons.  These rules operate worldwide for 3M and cannot be modified or waived ..."

- Page (9) paragraph (1) states; "Once you send us a copy of your patent or signed copy of our Non-Confidential Idea Submission Agreement, we will then have your idea reviewed by those people in 3M who are best able to evaluate it. "

- Page (9) paragraph (2) states; "Typically your idea will be assessed by researchers, marketing people, and one or more managers of our units. We may also seek an opinion from our patent attorneys on the potential strength of your patent rights if we think there is a chance we may wish to license or purchase those rights from you."

- Page (12) paragraph (1) states; "If the rules for submitting your idea sound strict, it's only because we're not trying to mislead you and because we want to protect our interests and yours. "

93.  Plaintiff alleges that tape-recorded voicemail messages to plaintiff from defendant's Do-it-Yourself employee, Art Pluim, contradicts claims made in paragraph (10) of David B. Patchett's June 7, 1999 summary; (that plaintiff's new product proposals were not brought to the attention of individuals within defendant's Do-it-Yourself Markets Division who were familiar with work defendant had done in the area of plaintiff's new product proposal, until September of 1997)

- Art Pluim's October 10, 1995, tape-recorded voicemail message stated, paraphrased; that plaintiff's new product proposal was being evaluated by defendant's marketing and legal departments. (Plaintiff's Exhibit F)

- Art Pluim's January 11, 1996, tape-recorded voicemail message stated, paraphrased; that plaintiff's new product proposal and plaintiff's patent application had been evaluated and the feedback was positive. (Plaintiff's Exhibit G)

94.  Plaintiff alleges that paragraphs 11, 12 and 13 of David B. Patchett's June 7, 1999 summary contradicts the claim made in paragraph 10 of David B. Patchett's June 7, 1999 summary which states, paraphrased; that it was not until September of 1997, before plaintiff's new product proposals were brought to the attention of individuals within the division who were familiar with the work defendant had done in the area of plaintiff's proposals.

95.  Plaintiff alleges that paragraph 11, 12 and 13 of David B. Patchett's June 7, 1999 summary clearly states and gives evidence that defendant had accessible documents of a conflict of interest between plaintiff and defendant in the area of plaintiff's new product

proposal, prior to April 3, 1995, when plaintiff submitted plaintiff's first new product proposal to defendant.

96.     Plaintiff alleges that defendant's records, documents and files of defendant's past research; which were accessible to Mark Farmer in 1997, were also accessible in 1995 and 1996 to individuals who were assigned to evaluate plaintiff's new product proposal and to execute defendant's policy of conflict of interest research, as defined in defendant's policy booklet "About Your Idea".

97.     Plaintiff alleges that even if the claims alleged by defendant in paragraph 10 of David B. Patchett's June 7, 1999, summary of events between plaintiff and defendant were believable; defendant's, statement in paragraph 10 of David B. Patchett's June 7, 1999 summary, would be admitting to defendant's gross negligence and misrepresentations to plaintiff by defendant not following defendant's own idea submission policy (as represented to plaintiff by defendant and as defined in defendant's "About Your Idea" booklet) for conducting a conflict of interest research between defendant's past work and external idea proposals.

98.     <u>Plaintiff alleges that it is absurd for defendant to expect plaintiff or this Court to believe that, when defendant's researchers researched plaintiff's new product proposal (in 1995 –1996) that defendant's researchers did not retrieve and review defendant's own records and files relating to the area of plaintiff's new product proposal.</u>

99.     Plaintiff alleges that in light of defendant's actions including; the adding of new instructions to defendant's 3M Indoor Window Insulator Kit in 1997, employing elements of plaintiff's new product proposal submitted to defendant by plaintiff on April 3, 1995; it is even more absurd for defendant to expect plaintiff or this Court to believe that plaintiff's new product proposal (from April 3, 1995 until September of 1997) conveniently evaded researchers and employees in defendant's own Do-It-Yourself Division, especially by those who would have known of the conflict of interest between plaintiff's new product proposal and defendant's alleged work in the area of plaintiff's new product proposal.

100.    Plaintiff alleges that in light of (1) the facts, (2) evidence of the existence of defendant's (accessible) research records mentioned in paragraph 11, 12 and 13 of David B. Patchett's summary, (3) defendant's written policy for avoiding conflict-of-interest issues between defendant's research and external ideas (as defined in defendant's "About

Your Idea" booklet), (4) the tape recorded voicemail messages from defendant to plaintiff stating that plaintiff's proposal and patent application had been evaluated by defendant and (5) the new instructions added in 1997 to the package of defendant's (3M) Indoor Window Insulator Kit infringing plaintiff's United States Patent No 5,626,175; it is obvious that defendant's claim that individuals (in defendant's highly sensitive and legal area of intellectual property) who evaluated and researched plaintiff's new product proposal (when submitted in April of 1995) were not made aware (through defendant's own accessible files and records) of the conflict of interest between plaintiff's proposal and work alleged by defendant in the area of plaintiff's new product proposal, is patently false.

101.   Plaintiff alleges that in light of the documented evidence revealed in the correspondences between defendant and plaintiff, including but not limited to: (1) communications between plaintiff and defendant by U.S. mail; (2) wire communications between defendant and plaintiff via telephone and facsimile machines; (3) tape recorded voicemail messages from defendant to plaintiff; (4) defendant's files and other records; (5) the signed Option Agreement between defendant and plaintiff; (6) defendant's policy booklet "About Your Idea"; (7) defendant's Intellectual Counsel, David B. Patchett's, version of a summary of events between plaintiff and defendant (which contradict itself and other information provided by defendant) and (8) defendant's predatory actions, which shows a clear pattern of deceptions and malicious misrepresentations by defendant against plaintiff; including but not limited to; (1) the misrepresentation of defendant's company policy (as represented in defendant's policy booklet "About Your Idea"); (2) defendant's failure to negotiate the contract of the Option Agreement between defendant and plaintiff in good faith; (3) the willful and intentional infringement of plaintiff's United States Patent by defendant and (4) the malicious use of the Option Agreement between defendant and plaintiff as a tool of deception to restrict against the marketing of the new energy-saving technology of plaintiff's product (which would have been a competitive product with defendant's (3M) Indoor Window Insulator Kit): makes it obvious that defendant, in violation of United States Antitrust Laws, (Under Title 15 – Commerce and Trade) used unfair methods of competition in and affecting commerce, and unfair and deceptive acts and practices in and affecting commerce.

102.    Plaintiff alleges, that defendant violated contract and United States antitrust laws by using unfair and deceptive methods of competition against plaintiff by misrepresenting to plaintiff, defendant's true purpose for defendant's proposed Option Agreement between defendant and plaintiff.

103.    Plaintiff alleges, that defendant drafted an Option Agreement between plaintiff and defendant and used deceptions and misrepresentations to induce and coerce plaintiff into signing the Option Agreement.  Plaintiff alleges that defendant's (now obvious) misrepresentations and deceptions to plaintiff includes; defendant's deceptively flaunting defendant's huge international marketing potential as a lure to induce plaintiff into signing defendant's proposed Option Agreement; by offering to pay five-thousand dollars ($5,000.00) towards helping plaintiff file for international patent protection; under the pretense that defendant was considering marketing plaintiff's product worldwide.

104.    Plaintiff alleges that defendant's pattern of unfair and deceptive methods of competition were exposed when defendant added new graphic and written instructions on the package of defendant's 1997 (3M) Indoor Window Insulator Kit.  Plaintiff alleges that the new instructions added to the package of defendant's Indoor Window Insulator Kit in 1997, instructs defendant's customers on how to employ and utilize the same elements of plaintiff's New Product Proposal which defendant had given plaintiff five-thousand dollars ($5,000.00) to help plaintiff file for international patent protection and had entered into an option agreement with plaintiff on April 15, 1996; in which defendant had drafted proposed terms to negotiate with plaintiff for the rights to the commercial use of those same elements.

105.    Plaintiff alleges that defendant's pattern of unfair and deceptive methods of competition against plaintiff is even more obvious in defendant's attempt to justify defendant's malicious and predatory acts against plaintiff (adding the new instructions in 1997 to defendant's (3M) Indoor Window Insulator Kit) which includes patent infringement and contract violations.

106.    Plaintiff alleges that defendant's actions continued to show a clear pattern of deceptions when defendant in David Patchett's summary of events (Plaintiff's Exhibit Z), attempted to justify defendant's actions against plaintiff by attempting to attack the validity of plaintiff's duly and legally granted United States Patent by referencing defendant's own

records and files, which were accessible to defendant's researchers and defendant's Intellectual Property Counsel when defendant's Intellectual Counsel proposed and drafted the Option Agreement between defendant and plaintiff, and prior to the drafting of the Option Agreement.

107.  Plaintiff alleges, that in light of defendant's malicious and deceptive acts against plaintiff, the foregoing facts and the fact that defendant's alleged reason for drafting the Option Agreement between defendant and plaintiff was for the purpose of legally binding plaintiff, to give defendant the first right to negotiate with plaintiff for the commercial use of the information shown and described in plaintiff's New Product Proposal; elements of the same information defendant added in 1997 to defendant's 3M Indoor Window Insulator Kit. Plaintiff alleges that defendant's violations of United States Antitrust Laws; by defendant using unfair and deceptive methods of competition against plaintiff and by defendant using unfair and deceptive methods of competition in and effecting commerce is well established: by defendant's files, by defendant's pattern of deceptions, by defendant's misrepresentations and by, but not limited to the foregoing facts.

108.  Plaintiff alleges that it is now obvious that defendant's pattern of deceptions and misrepresentations to plaintiff includes, defendant drafting terms into the Option Agreement between defendant and plaintiff which legally restricted plaintiff from showing plaintiff's New Product Proposal to defendant's competitors or other independent manufacturers; defendant meanwhile in 1997 added new instructions on the package of defendant's (3M) Indoor Window Insulator Kit, showing elements of plaintiff's New Product Proposal and distributed those packages world wide, maliciously destroying any new product marketing impact for plaintiff's product.

109.  Plaintiff alleges that defendant's Do-it-Yourself Marketing Department was well aware of the advantages of being the first on the market with a new product and that defendant in violation of antitrust laws used unfair and deceptive methods of competition, by using the Option Agreement as a tool of deception to legally restrain the development of a commercial market for plaintiff's product.

110.  Plaintiff alleges that defendant's motive, to sabotage and restrict the technology and the development of a commercial market for plaintiff's product, was greed and was perpetuated by defendant's resource advantage over plaintiff.

111.   Plaintiff alleges that defendant's Do-it-Yourself Marketing Division markets the 3M Indoor Window Insulator Kit as a temporary fixture; to be used only during the heating season and relies heavily on the repeat sale of millions of units each year. Defendant even has instructions on defendant's 3M Indoor window Insulator Kit, instructing the customer on the removal of the film at the end of the heating season. (Plaintiff's Exhibit R)

112.   Plaintiff alleges that it was obvious to defendant's Do-It-Yourself Marketing Division, that attractive and durable retrofit reinforced access-port components allowing blinds to be operated through the plastic film; as shown and proposed in plaintiff's New Product Proposal and if added to Indoor Window Insulator Kits; would upgrade the look, the durability and the efficiency of Indoor Window Insulation Kits to the level a of new and improved product which could be marketed as such "Improved".  Plaintiff alleges that it was obvious to defendant that many customers would view the "Improved Product" less as a temporary fixture and thus leave the fixture installed indefinitely or until damaged; to include saving energy during seasons when air conditioners are used.

Plaintiff's second new product proposal forwarded to defendant on September 15, 1997 even provided a simple and effective method to allow the ventilation of fresh air through the plastic film on warm days.  (Attached hereto as Plaintiff's Exhibit P)

113.   Plaintiff alleges that it was obvious to defendant 's Do-it-Yourself Marketing Division, that plaintiff's proposed upgrade to Indoor Window Insulator Kits, if commercially marketed; added features that would benefit the consumer but would also simultaneously cut back on defendant's repeat annual sales.

114.   Plaintiff alleges that defendant in violation of contract and antitrust laws, used the Option Agreement between defendant and plaintiff as a tool of deception and as an unfair method of competition, to restrict the development of a commercial market for plaintiff's upgrade and improvements to Plastic Film Indoor Window Insulation Kits; while defendant knowingly, intentionally and maliciously sabotaged the new product market for plaintiff's upgrade product by adding instructions on the package for defendant's (3M) Indoor Window Insulator Kit, instructing the customer to crisscross four pieces of tape to build a makeshift and more disposable access-port which consumers would be more likely to remove at the end of the heating season.

115.    Plaintiff alleges that defendant's unfair methods of competition and defendant's predatory and malicious acts have severally damaged plaintiff.

116. Plaintiff alleges that defendant's malicious acts of sabotage and restrictions against the energy-saving technology of plaintiff's improvements to Plastic Film Indoor Window Insulation Kits, have adversely affected commerce by doing irreparable damage to the development of a commercial market for plaintiff's product and have damaged and disadvantaged consumers throughout the world, by depriving consumers the choice and the benefits of a competitive and a more energy-efficient product.

117. Plaintiff alleges that the conveniences and the energy-saving technology restricted against in Indoor Window Insulation Kits by defendant and denied to consumers, by defendant's deceptive and unfair methods of competition includes;

- the time-saving convenience of the consumer being supplied with ready-made, durable, retrofit adhesive-backed access-port components for easy application to Plastic Film Indoor Window Insulation Kits assemblies; eliminating for the customer, the time consuming and cumbersome project of crisscrossing strips of adhesive-backed tape on the flexible plastic film to build makeshift access-ports, according to the instructions added by defendant, in 1997 on the package of defendants (3M) Indoor Window Insulator Kits,

- the energy-saving reinforced patented flaps of plaintiffs access-ports, which closes to fit around the blind's operating control members, to form a seal to prevent the loss of heat from the dwelling through the access-ports,

- the benefit of the patented pre-cut crisscross opening, located in the center of each adhesive-backed access-port, which not only provides the energy saving flaps, but also serves as visual guides for the customer to make and maintain precision cuts through the plastic film within the confines of the reinforced access-ports and,

- the benefit of the ready-made retrofit reinforced access-ports, with the patented crisscross opening through the center of the access-ports, which also provides the consumer with the convenience of visually aliening the openings in the access-ports (on the plastic film) over the blind's operating controls; which

provides the consumer with the benefit of positive locations for making the openings through the plastic film to access the blind operating controls.

118.  Plaintiff alleges that defendant's malicious, deceptive and predatory acts of restriction against the technology of plaintiff's product have not only done irreparable damage to plaintiff but has also damaged and disadvantaged the consumer.

119.  Plaintiff alleges that defendant's acts of restrictions against the time-saving technology of plaintiff's product has disadvantaged the consumer, by restricting against the ready-made access-ports of plaintiff's New Product Proposal, by adding instruction in 1997 on defendant's (3M) Indoor Window Insulator Kit; instructing the consumer to waste unnecessary time to build cumbersome makeshift access-ports on the plastic film.

120.  Plaintiff alleges that defendant's instructed version of makeshift access-ports, as illustrated in (Fig. D), of defendant's instructions on the back of the package for defendant's (3M) Indoor Window Insulator Kit, leaves at least (1/2") one-half inch unsealed holes in the plastic film, which creates areas for drafts and allows heat to escape from the dwelling through the plastic film.

121.  Plaintiff alleges that defendant's act of restriction against the energy-saving technology of plaintiff's product, has damaged the consumer by causing consumers who use defendant's instructions to build the less energy-efficient makeshift access-ports, which in turn causes the consumer to pay higher heating and utility bills, than that which could have been realized if consumers were afforded the benefits of the energy-saving technology of plaintiff's Improvements to Plastic Film Indoor Window Insulation Kit.

122.  Plaintiff alleges that defendant's experience and knowledge in the field of energy-saving technology makes it obvious that defendant was well aware of the damages done to the consumer (loss of heat through the makeshift access-port resulting in higher heating and utility bills) as well as the damages done to plaintiff by defendant's restriction against the energy-saving technology of plaintiff's product.

123.  Plaintiff alleges that the damages done to the consumer and to plaintiff by defendant's restriction of the energy-saving technology of plaintiff's Improvements to Plastic Film Indoor Window Insulation Kits, was willful, intentional and was motivated by defendant's selfish greed.

124.    Plaintiff alleges that defendant's actions in the past and the foregoing facts of this complaint establishes that defendant has in the past and defendant continues to show a clear and undeniable pattern of deception and misrepresentations against plaintiff and defendant has willfully and intentionally restricted against a market for the energy-saving technology of plaintiff's product.

125.    Plaintiff alleges that defendant's pattern of misrepresentations is also shown in defendant's advertisement for the 3M Indoor Window Insulator Kit.

- In 1997 the packages for the 3M Plastic Film Insulator Kit Product Line were all given a new look:  the Indoor Patio Door Insulator Kit, the Outdoor Window Insulator Kit and the Indoor Insulator Kit.

- Since the operation of blinds through the plastic film does not apply to the Patio Door Kit or to the Outdoor Kit, the installation instructions on the back of these packages basically did not change.

- The only in installation instruction changes made to the 3m Plastic Film Insulator Kit product-line in 1997, were the new installation Instructions  added to the back of the package for the 3M Indoor Window Insulator Kit.

- The photos of the 3M Indoor Window Insulator Kit shown in defendant's, 1998 and 1999 Home Depot catalog advertisements are photos of the old package design for defendant's 3M Indoor Window Insulation Kit; prior to the changes and the new installation instructions added in1997.  (Home Depot catalog advertisements attached hereto as Plaintiff Exhibit AA).

- Plaintiff alleges that it is more than curious that in the same Home Depot ads in which defendant displays up to date photos of the new packages for the 3M Patio Door Insulation Kit and displays up to date photos of the new package for the 3M Outdoor Window Insulation Kit; in the same, Home Depot ads, defendant use photos of the old package design for the 3M Indoor Window Insulator Kit and does not show update photos of defendant's new package for defendants Indoor Window Insulator Kit which certainly were available at the time the ads were put together by defendant's marketing department.

- Although the 3M Home Depot advertisements show photos of the 3M Indoor Window Kit prior to the changes made and the new instructions added in 1997, the point of purchase displays in retail stores through out the world, defendant

as of 1997, 1998 and 1999 was, and is still selling defendant's 3M Indoor Window Insulator Kit using the new package with the aesthetic changes and the new instructions added in 1997. (Photos of 3M Indoor Window Insulator Kit point of purchase displays at the Home Depot in Cleveland, Heights, Ohio, attached hereto as Plaintiff's Exhibit B-B).

126.  Plaintiff alleges that in light of the foregoing facts, it is obvious that defendant's marketing department purposely and deceptively does not show, in defendant's Cleveland Heights, Home Depot ads (Plaintiff's Exhibit B-B), a photo of the update version for the 3M Indoor Window Insulator Kit's package (Plaintiff's Exhibit R).  Plaintiff alleges that defendant purposely and deceptively shows photos of the old package (which is no longer used by defendant) for the 3M Indoor Window Insulator Kit (Plaintiff's Exhibit U), in defendant's Home Depot ads.  Plaintiff alleges that defendant displays a photo of the old package for the 3M Indoor Window Insulator Kit (Plaintiff's Exhibit U) in the Cleveland Heights, Home Depot ads; for the purpose of confusing the issue of defendant's infringement of plaintiff's United States Patent and also for the purpose of confusing the issue of the timeline of defendant's active promotion of defendant's new patent infringing,3M Indoor Window Insulator Kit package (Plaintiff's Exhibit R).

127.  Plaintiff alleges that the facts and information in this complaint clearly establishes that defendant, in violation of antitrust laws; used unfair methods of competition against plaintiff in and affecting commerce and used unfair and deceptive acts and practices against plaintiff in and affecting commerce.

128.  Plaintiff alleges that defendant's antitrust violations described herein have caused great and irreparable damage to plaintiff and defendant will continue the same unless enjoined by this Court.

129.  As a direct and proximate consequence of defendant's actions, plaintiff has severely suffered damages including, without limitation, pain and suffering, loss of income, financial hardship, embarrassment, humiliation, loss of respect, family problems, health problems and other consequential and incidental damages.

**Wherefore,** plaintiff demands that the Court enter judgment in his favor and against defendant, in doing so, award plaintiff compensatory damages in the amount of TEN MILLION DOLLARS ($10,000,000.00); punitive damages in the amount of FIVE MILLION DOLLARS ($5,000,000.00)- plaintiff's reasonable attorney's fees; cost- pre-and post-judgment interest- and such other relief as the Court deems just.

Respectfully submitted

Donald B. Keys (plaintiff)

**JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues.

Donald B. Keys  (plaintiff)